109 So.2d 426

WATERWORKS DISTRICT NO. 3 OF RAPIDES PARISH, Louisiana,

v.

CITY OF ALEXANDRIA.

No. 44211.

Jan. 12, 1959.

Rehearing Denied March 23, 1959.

Gold, Hall & Skye, Alexandria, for appellant.

Frank H. Peterman, Alexandria, for City of Alexandria, appellee.

FOURNET, Chief Justice.

The plaintiff, Waterworks District No. 3 of Rapides Parish, Louisiana, instituted separate suits in the District Court for the Parish of Rapides against the City of Alexandria and the City of Pineville, to recover amounts claimed to be owed for water sold by plaintiff and delivered to defendants during the period beginning September 15, 1955, and ending May 15, 1957.[1]

1. In two prior suits against the same defendants the plaintiff's claim was for amounts representing water sold and delivered to each City during the months

The pleadings and issues being identical in the two cases, they were consolidated for hearing in the Court below and resulted in judgments maintaining exceptions of no cause and no right of action filed by each defendant and dismissing plaintiff's suits. The plaintiff's appeals from those judgments, likewise consolidated for argument in this Court, are now before us, and what is said herein with reference to the City of Alexandria is equally applicable to the City of Pineville.

■ The well-pleaded facts of the petition and the contents of attached documents and exhibits, which are controlling in a determination of the exceptions of no cause and no right of action, show that the plaintiff (a waterworks district created and operating under the Constitution and laws of Louisiana), acting upon authority of the Waterwork Commissioners of the District under a resolution adopted for the purpose, executed separate contracts with the defendant cities on May 4, 1950, for the furnishing of water and services to them in accordance with the terms and provisions of the agreements;[2] that according to Section 6 of the agreement, the

of July and August, 1955, at increased rates; on appeal here from judgments dismissing, on exceptions of no cause and no right of action, the said suits, we held that since the defendant City in each instance was indebted to plaintiff at least to the extent of the originally contracted monthly minimum charge for the water used in July and August, 1955, the petitions stated a right and a cause of action, so that the exceptions were overruled and the cases remanded for further proceedings. See Waterworks District No. 3, of Rapides Parish v. City of Alexandria, 231 La. 903, 93 So.2d 211. Those actions, it appears, remain pending on the docket of the Ninth Judicial District Court, and the plaintiff filed the instant suits against the two cities to cover the subsequent period. The only difference between these actions and those disposed of in our previous opinion (other than the period of time covered and the amounts involved) is that, by the terms of an agreement of April 19, 1956, a copy of which is attached to the petition, the defendants agreed to pay plaintiff for water and services furnished at the old rate per one thousand gallons and plaintiff agreed to accept such

payments, without prejudice to plaintiff's right to claim a higher rate in future litigation.

2. The contract contains a preamble to its terms and conditions, incorporating a recitation of the purpose for which the Water District was created and other matters; in substance, it is said that whereas the Seller (Waterworks District) was organized to construct a system of waterworks utilizing the Big Creek Dam, and the United States government had already constructed certain installations and facilities to provide water for Camp Livingston, including a filter plant, the Big Creek Dam itself, a transmission line and other installations, representing an original investment of more than $1,500,000; that a serious water shortage was developing in the area and it was vitally essential that the said installations and facilities should be preserved and used, and this could be accomplished at relatively small cost to all parties concerned if the system could be completed; that the cities of Alexandria, Pineville, the several State institutions in the area, and Camp Beauregard, which the system would serve, could use and actually needed the water (300,000 gal-

price to be paid by defendant for water delivered during the first fourteen months in which plaintiff's water system was in operation was the sum of 10¢ per one thousand gallons, and thereafter in each succeeding fiscal year (a fiscal year being the same as the calendar year) for the life of the agreement, fixed at thirty-five years, the price should remain 10¢ per one thousand gallons, unless after negotiation and taking into full consideration the expenses of administration, operation and maintenance of the system, the payment of principal and/or interest on certain revenue bonds which were to be secured by an act of mortgage on the property of plaintiff and pledge of its revenues, and the amounts necessary to accumulate and maintain such reserve, renewal, replacement, contingencies

lons a day in the case of the cities) to supplement their diminishing supply; that the system would cost approximately $1,500,000 and "can be financed upon a sound basis by the issuance of revenue bonds to run for a period of at least thirty-five (35) years to be secured only by proceeds or revenues derived from the operation of the system;" that without the benefit of the existing installations and facilities (which, under a certain "plan," were to be purchased from agencies of the United States government at relatively small cost) a system of the same scope and extent would cost in excess of $2,500,000; that the purchase had to be promptly carried out in order to avoid the sale, salvage and complete destruction of the installations and facilities; that there was the further possibility that if Big Creek supply were not maintained and preserved, the increasing shortage would bring on an

or other funds as may be required by the said Act of Mortgage and Pledge, the rates should be adjusted and changed by the mutual consent of the parties; "provided nothing herein shall be construed as creating a legal obligation on the part of Buyer to pay more than 10¢ per 1,000 gallons."

On September 15, 1950, an Act of Mortgage and Pledge (dated for convenience of record as of July 1, 1950) was executed by the plaintiff in favor of the Rapides Bank & Trust Co. in Alexandria, mortgaging the properties and pledging the income and revenues therefrom; this instrument contained the recitation that the plaintiff was acting "in strict compliance with and by virtue of" the authority of Article 14, Section 14(m) of the Louisiana Constitu-

emergency which would prove very difficult to solve and would be impossible of solution upon any basis as sound and economical as that afforded by the proposed system; and in order to complete the construction of the system it was necessary and permissible for the parties to the agreement, availing themselves of the Local Services Act (R.S. 33:1321 et seq., by which a municipality and special district created to perform a public service "may engage jointly in the exercise of any power," including activities concerning "public utility services, such as water"), to enter into a conjoint plan and to contract in reference thereto; "Now, Therefore, in consideration of the mutual covenants and agreements herein contained, Seller agrees to sell and Buyer agrees to buy water upon the terms and conditions and for the consideration hereinafter set forth: * * "

tion[3] and Part 1 of Chapter 10 of Title 33 of the Louisiana Revised Statutes of 1950;[4] and was acting also pursuant to provisions of a Resolution of the Board of Waterwork Commissioners which authorized the issuance of $2,000,000 Water Revenue Bonds of Waterworks District No. 3 of Rapides Parish and provided for the security and payment thereof, including the execution of a mortgage to secure such payment.[5] The revenue bonds thus secured, to an amount of $1,750,000, were issued and sold on September 28, 1950, and proceeds from the sale were used to acquire the then existing installations and facilities, to complete the waterworks system and to equip

same for furnishing water in accordance with contracts, including those between the plaintiff and the City of Alexandria and City of Pineville. The water service was begun on November 15, 1951, and has continued since that time.

The rates at which the water and service were being furnished proved grossly inadequate to provide revenue sufficient to meet expenses of operation and maintenance, to provide payment of interest and principal of obligations, including the bonds, and to make payments into the Bond and Interest Redemption Fund and Renewal and Replacement Fund—thereby causing acts of default to occur under the Act of Mort-

3. The pertinent portion of Section (m) of Section 14 of Article 14, added by Act 375 of 1938, provides in part that for the purpose of constructing, acquiring, extending or improving any revenue producing public utility as defined elsewhere, the Legislature may authorize any taxing district authorized to issue bonds under that Section 14, to issue its revenue bonds; and "shall provide that any bonds issued hereunder shall be secured by a conventional mortgage on the entire utility so constructed, acquired, extended or improved, and by pledge of the income and revenues thereof, sufficient in amount to pay principal of and interest on said bonds as they severally mature; * * * [and] shall also provide that when bonds are issued hereunder, the issuing subdivision or district must impose rates for the services rendered by the utility *fully sufficient to operate and maintain the utility, to pay principal of and interest on the bonds, and to provide an adequate fund for depreciation, improvements and extensions * * *.*" (Emphasis supplied)

4. Part 1 of Chapter 10 of Title 33 cov-

ers the subject to ownership, operation and financing of public utilities, and comprises R.S. 33:4161–4168 (Sub-Part A, General Powers), 33:4221–4230 (Sub-Part B, Mortgage of Property and Pledge of Revenues of Utility), 33:4251–4262 (Sub-Part C, Pledge of Revenues of Utility), and 33:4281–4290 (Sub-Part D, Cities of 25,000 to 250,000).

5. Among other provisions, this Act of Mortgage and Pledge obligated plaintiff to "fix and collect rates and charges for all water and services supplied by the mortgaged properties fully sufficient, after making due allowance for delinquencies in collection, to provide for the payment of the reasonable and necessary expenses of operating and maintaining the mortgaged properties, to provide for the payment of interest on and principal of all obligations payable therefrom, including the bonds, as and when the same become due and payable, and to make the payments into the Bond and Interest Redemption Fund and Renewal and Replacement Fund hereinabove required." (Art. VI, sub-paragraph G).

gage and Pledge including the failure to pay the interest coupons falling due on July 1, 1955.

Meanwhile, on January 31, 1955, plaintiff had advised defendant by letter that the rate of 10¢ per thousand gallons had proved inadequate, that it was imperative that the water rates be revised upward, and requested that it be advised of the earliest convenient time for a meeting between the proper officials of the plaintiff and defendant in order to negotiate new water rates; but the defendant "failed and refused" to meet, as requested. On June 24, 1955, the plaintiff again addressed a written request of similar import to defendant,[6] expressed the feeling that the City's inaction constituted a refusal to negotiate and establish new water rates, and advised that failure to reply before June 30, 1955, would be construed as an indication of such refusal; thereupon a new rate would be established effective with the month of July, 1955, and would be communicated to defendant. In answer, on June 28th, the defendant advised plaintiff "There is no occasion for the officials of the City to have a meeting with representatives of the Water Works District as the purpose would be, as stated in your letter, to revise the rates up. The City of Alexandria intends to abide by its written contract with the Water Works District, and expects the District to do the same."

The plaintiff at that date had already instituted steps to increase the rates charged to other customers in an amount sufficient to discharge the proportionate share of each in its expenses and obligations; in like manner a determination was made of the rate to be charged de-

---

6. The letter in its entirety, addressed to the Commissioner of Finance and Public Utilities, City of Alexandria, reads as follows:

"In our letter to you of January 31, 1955, we advised that the present water rates established for the City of Alexandria have' proved to be inadequate for the Water District to meet the expenses of administration, operation and maintenance of the system and to comply with the obligations under our Mortgage and Bond indebtedness; We further advised that it was imperative that the rates be revised upward. In this letter, we requested that a meeting be held with representatives of the Water District and officials of the City of Alexandria in attendance for the purpose of negotiating new water rates.

"Since that time, notwithstanding our continued efforts to settle this matter, the City of Alexandria has failed to comply with our request to negotiate and establish new rates. We feel that this inaction on the part of the city constitutes a refusal to so negotiate and establish new water rates and, unless we hear from you prior to June 30, 1955, indicating that the City is willing to enter into negotiations for the purpose of revising the water rates upward, we will assume that the city refuses to so negotiate.

"We will thereupon establish a new rate, effective for the month of July, 1955, and thenceforth, and will communicate same to you."

fendant cities, and by Resolution of its Board of Commissioners on June 30, 1955, established said rate (in the case of Alexandria) at $3,000 per month for the first 15 million gallons of water used plus a fixed sum for all usage in excess thereof; the defendant was furnished with a certified copy of the Resolution and was notified that effective July 1, 1955, water furnished to Alexandria would be billed at those rates. The statements for water and services furnished during July and August were calculated at the new rate and defendant was billed accordingly; the defendant, as payment in full, tendered checks in a lesser amount, but these were returned by plaintiff, and the former suit against defendant was instituted. During the succeeding months,[7] beginning with September, 1955, the plaintiff continued to bill defendant according to the new rate and continued to return defendant's checks calculated at the old rate, so that each monthly statement sent by plaintiff carried forward an increasingly large unpaid balance, and this state of affairs continued until April, 1956, when the parties, by written agreement dated April 19th, provided that the defendant would pay at the old rate, the plaintiff would accept but would continue to bill defendant at the new rate, "with the understanding that such action will not be construed as an admission against interest by either party or as creating an estoppel, acquiescence or otherwise affecting in any manner the rights of [either party] which are now, or which may hereafter be asserted in any law suit or other proceeding by either the City or the District."[8] The difference between the total paid and the total billed during the period covered by this suit is $28,879.24, which is claimed as an unpaid balance, with interest from the respective due dates (15th day of the month following rendition of the bill) of each

7. References are found in the Trial Judge's Reasons and in plaintiff's brief to an injunction suit by which plaintiff was enjoined from cutting off the water supply of the cities of Alexandria and Pineville; the date of that proceeding is not shown, but it bore No. 46,833 on the Docket of the Ninth Judicial District Court for Rapides Parish and occurred before Feb. 20, 1956, the date judgment was rendered below in the former cases. From that ruling the plaintiff did not appeal.

8. It now appears, according to a statement in the Reasons of the Trial Judge in the instant case, that his ruling on the exceptions in the prior litigation covered only the question of plaintiff's claim for the additional charge under the rate increase, since the Court below had been informed that counsel had come to an agreement with reference to the claim under the contractual monthly minimum charge and *that* point was no longer an issue in the case; but (the Trial Judge further explained) such agreement appears not to have been inserted in the record or brought properly to the attention of the Supreme Court, with the unfortunate result that this Court did not pass upon the issue determined by the lower court in the first case, leaving unsettled the legality of the rate increase.

statement, and the prayer of the petition is in accord therewith.

The District Judge, in deciding the instant cases, adopted the Reasons he had prepared in the previous suits in which the conclusion reached, following a painstaking and earnest examination of the opposing contentions, was that under the terms of the contract a rate change could be effective only at the beginning of, and not during, a fiscal year; that the operative effect of the contract was *not* to bind plaintiff to the obligation of furnishing water for thirty-five years at the rate of ten cents, but rather that the rate was fixed at ten cents for each fiscal year after the trial period (fourteen months) for as long as the contract remained in effect provided the parties have not agreed on a new rate, and that "the agreement may be terminated at the end of any fiscal year because of disagreement as to rate whereby the District insists on a higher rate being negotiated and the City refuses to be legally bound for anything more than the initial fixed charge." To that ruling the following explanation is made by the Trial Judge (in additional reasons rendered in the instant suits): "This Court has not, in its former opinions, either held or intimated that the contract could be terminated by the unilateral action of the plaintiff District in increasing rates," with the additional observations: "In the instant petition it is not alleged, nor has it been argued, that the plaintiff formally terminated the contract at the end of 1955, or at any other time. The simple situation is that the plaintiff, after notifying defendant of the new rate, delivered water to the City with knowledge of the latter's refusal to pay anything more than the old rate. Actually, the agreement of the parties provides for a fixed price of ten cents for the trial period and for each fiscal year thereafter unless, after negotiation, 'the rate may be changed and adjusted by the mutual consent of the parties.' During the period the water sued for in this suit was delivered the contract had not been terminated nor had the price been changed and adjusted by the mutual consent of the parties. In this situation, the old rate, by express provision of the contract, remained in effect." On that basis, the Court again determined that the exceptions of no cause and no right of action were meritorious, and dismissed plaintiff's suits.

The plaintiff-appellant, relying on rules of contract interpretation, especially those dealing with true intent of the parties, stressing that this is to be gathered from all parts of the contract rather than one clause, and that the Constitution and statutes of the State form a part of and must be read into a Louisiana contract, argue that the recitation preceding the terms and conditions (see footnote 2 herein) shows that the parties intended to

establish reciprocal rights and obligations, and contend that applicable provisions of the Constitution and statutes bring about the result that the plaintiff not only had the authority to raise the water rates but was under a legal obligation so to do; (2) alternatively, that the agreements between plaintiff and the cities are contracts of sale; that the price fixed for the sale of water and services is not certain, fixed or determined as required by law, so that the agreements are null as lacking one of the essential elements of a contract of sale, and consequently the plaintiff was legally justified in raising the rates; and (3) in the final alternative, the agreements constituted an attempt to surrender irrevocably, or barter away, the rate fixing power of the State, and were void ab initio as in violation of Article 19, Section 18 of the Constitution and laws of Louisiana, and accordingly, the plaintiff was legally justified in raising the rates.

Counsel for defendant-appellee stand on the correctness of the trial judge's ruling and on that portion of the agreement between the parties, said to be clear and not open to construction, which provides that "nothing herein shall be construed as creating a legal obligation on the part of the Buyer to pay more than 10¢ per 1,000 gallons." Arguing that the City of Alexandria was not a party to the Act of Mortgage and Pledge nor consulted as to any of its terms and conditions, counsel assert that the plaintiff had no legal right to increase by compulsion the rates charged the City—that type of authority being vested in the Louisiana Public Service Commission by Article 6, Section 4 of the Constitution of Louisiana; and even were it otherwise, since the City of Alexandria forms no part of the Water District, the plaintiff's imposition of higher rates by compulsion could not affect the City nor make it liable for the plaintiff's bonded indebtedness. In reply to appellant's arguments, counsel for defendant say that the requirements of Article 14, Section 14(m) of the Constitution (see footnote 3 herein) are not self-operative, but require an act of the Legislature to make them effective, and cannot be relied upon as automatically being read into the contract because the implementing statute has never been enacted;[9] and with regard to the

9. The Trial Judge made this point clear by observing that R.S. 33:3811 et seq. is the legislative enactment authorizing the creation of waterworks districts as subdivisions of the State and providing that they may issue bonds in accordance with the provisions of Section 14 of Article 14 of the Constitution. As to the fixing of rates, the statute has only this to say: "The commissioners of a waterworks district *may* fix the rates at which it will supply water to persons within as well as outside the district and may dispense water from its waterworks system upon a flat rate or upon a meter rate * * *." (R.S. 33:3820) (Emphasis supplied) He also noted that this statutory provision was not written in obedience to Section 14(m) as amended in 1938, since it is merely a revision of a 1926 Act.

claim of abridgement of the police power, there has been failure to distinguish between rate fixing by compulsion, a governmental function, and rate fixing by contract.[10]

We find it unnecessary to discuss the merits of the foregoing contentions[11] in view of a clause in the contract which has received scant notice but which, we think, completely disposes of the issues; we refer to Paragraph 10, as follows: "Modification. This agreement may be changed or modified only with the consent of the governing bodies of both Buyer and Seller. Such modification may be requested by either party, *in which event a joint meeting of such governing bodies shall be held not less than ninety (90) days after the giving of such notice,* at which joint meeting the requested changes or modifications *shall be considered and discussed,* but consent thereto shall be given by each governing body meeting independently thereafter at its regular meeting place. No such change or modification may be made which will unfavorably affect the prompt payment when due of all principal of and interest on any bonds which may have been issued by Seller payable in whole or in part from revenues derived from the operation of its water system." (Emphasis supplied)

▮▮ Unquestionably, the City of Alexandria breached its contract for, as stated above, not only did it "fail and refuse" to comply with plaintiff's first request of January 31, 1955, for a joint meeting to discuss a modification of the terms of the agreement, thereby ignoring the requirement that such meeting "shall be held not less than ninety days" after the notification, but when the subsequent written request of June 24, 1955, again gave notice of plaintiff's desire to meet for the purpose of negotiating for upward revision of the water rates, the plaintiff refused and, by its letter of June 28th, advised that there was no occasion for a meeting of officials of the City and representatives of the District to revise rates upward and it, the City, expected the District to abide by its written contract. The plaintiff District, for its part, was not only justified in establishing rates sufficient to meet its

---

10. This Court had for consideration the identical question in the recent case of United Gas Corporation v. City of Monroe, Louisiana, 236 La. 825, 109 So.2d 433.

11. A contention which might have been made, in view of Paragraph 9 of the contract declaring: "Term of Agreement. This agreement shall continue in force for a period of thirty-five years from the first delivery or tender of delivery of water by Seller hereunder," is that defendant city's act was ultra vires, for R.S. 33:4164 provides that "Municipal corporations may make contracts, extending over a period *not exceeding thirty years,* with other municipalities and political subdivisions for the sale or purchase of an adequate supply of water and electricity to meet their requirements; * * *" (Emphasis supplied)

obligations, but was in fact legally bound so to do; the people of this State, in adopting the addition to Section 14(m) of Article 14 of the Constitution (footnote 3 herein), imposed the condition that the rates for water must be adequate to yield revenues to meet certain obligations. Regardless of whether or not legislation has been adopted specifically implementing those provisions of Section 14(m), the bonds, which are now incontestable, were issued in accordance with that Section; moreover, the plaintiff District is bound by similar language in its Act of Mortgage and Pledge securing the revenue bonds (see footnote 5). Since the contract with the City for water at the old rate became ineffective, and the plaintiff is obligated as stated above, it necessarily follows that the City must pay for water taken from plaintiff at a rate which is sufficient to yield the City's proportionate share of the expenses and other obligations of plaintiff, and therefore that the exceptions of no cause and no right of action filed by the defendant are without merit.

For the reasons assigned, the judgment appealed from is annulled and set aside, the exceptions of no cause and no right of action are overruled, and the case is now remanded for further proceedings in accordance with the views above expressed.